COLUMBIA CASUALTY CO. et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 4782.   Decided September 20, 1929.   (281 P. 198.)

*Bagley, Judd & Ray,* of Salt Lake City, for plaintiffs.

*Geo. P. Parker,* Atty. Gen., and *F. A..Trottier,* Asst. Atty. Gen., for defendant commission.

STRAUP, J.

The Industrial Commission under our Workmen's Compensation Act (Comp. Laws 1917, § 3061 et seq. as amended) made an award to Joseph Graff against J. L. Griffith Company and the Columbia Casualty Company, its insurance carrier. The question on review of the proceedings is the sufficiency of the evidence to justify the finding made by the commission that Graff at the time of his injury was in the employ of the Griffith Company. It is the contention of the petitioners on this review that the evidence is insufficient in such respect and that it shows that Graff at the time of his injury was in the employ of an independent contractor or contractors and not in the employ of the Griffith Company.

The Griffith Company had entered into a contract with the state to construct a state highway in the vicinity of St. George. The work was being carried forward in two sections spoken of as section 80-A and section 80-B. There is not much dispute that for several days Graff worked for and was in the employ of the Griffith Company grubbing, piling, and burning brush on section 80-A. That work was done under the direction of a shift boss or foreman of the Griffith Comapny who supervised and directed the work. The Griffith Company, as contended by the applicant, also had in its employ seven or eight men with teams doing work grubbing, clearing, and grading on section 80-B. It is the contention of the insurance carrier that these men

were independent contractors, and that Graff was in the employ of one of them. The question thus turns on the relation existing between these men and the Griffith Company and as to whether Graff was in the employ of one of them or in the employ of the Griffith Company.

With respect to the matter, but two witnesses testified, Graff and John L. Griffith, the manager of the Griffith Company and who had charge of the construction work. Graff testified, that he was working for the Griffith Company, that he hired out to it, and that its shift boss or foreman directed his work of grubbing, piling, and burning brush on section 80-A. After working there for several days Graff was transferred "down the line" on section 80-B, where Alton Gray was at work, one of the seven or eight men working on section 80-B, grubbing, clearing, and grading. When asked who transferred him Graff answered, "I don't know"; that Gray told him that "Griffith wished this brush cleared off where Gray was working with his team." Graff went to that place and started grubbing and clearing brush and rolling rock in washes so that teams could go through. That work, as testified to by Graff, was done under the supervision and direction of a Mr. Bell, the superintendent of the Griffith Company and who directed Graff and told him what to do. After doing that kind of work for several days Bell inquired of Graff if he had had experience in the use of powder and in blasting, and was told that he had good experience in that kind of work. Thereupon Bell gave Graff powder and fuse and directed him to blast rock. Graff did that for several days when he was injured in blasting a large rock or boulder. Graff further testified that he did not know whether Gray or the other men had contracts with the Griffith Company, and did not know anything about the relation of such men with the Griffith Company; that "I didn't know nothing about that business at all."

John L. Griffith, the manager of the Griffith Company, testified:

"Mr. Graff worked for us several days, probably a week, clearing brush, as he states first on 80-A and then on 80-B on the other side of the mountain. About that time I entered into a verbal contract with Alton Gray and eight or nine associates. These boys were farmers on Ivins and Santa Clara, and they had some stock. Each one brought a four-horse team, but they didn't have any equipment, and they didn't have any money, and they wanted work. So I gave them a piece of work on the highway. On highway and railroad work it is called station work. That is, I gave them a certain distance to do and paid them a yardage. I was responsible for their bills, and I had to furnish their equipment and pay off their labor and pay their feed bills. They would write an order and sent it up to my office and I would write a check for it. A few days before Mr. Graff was injured he was on this project 80-B with Mr. Bell clearing. Mr. Bell was my superintendent at that time on 80-B. Then, as Mr. Graff has stated, Mr. Bell took him out to blast rock. Now they charged—his wages would be charged against Gray and company, the men that were on that certain piece of work, and the money to pay them came from me.

"Q. Did he (Bell) have anything to do with the details of the work and directing those men? A. He had everything to do with it. They were under his charge, working under his direction. He showed them where to plow for their barrow pits, and when to blast rock, and in a general way, the orders he issued.

"Q. You considered that he had a right to supervise? A. Absolutely.

"Q. In every detail? A. In every detail. They carried no cash, and I told them I would take care of their compensation over there * * * Everything was not under the supervision of the eight men. Everything was under the supervision of this Mr. Bell. Those men, instead of paying three and a half a day or six and a half a day, we paid them in yardage. They didn't have any supervision at all. They were out there working together as laborers and teamsters doing the work; they didn't have any authority—one man didn't have any more than the other. They were a station gang in the vernacular of construction men; a station gang they don't have any boss; I had to put my boss over them to show them what to do and supervise their work."

Such testimony, in our opinion, does not under our statute or under the authorities render such men independent contractors. Comp. Laws Utah 1917, § 3110; *Wooton* v. *Dragon Consol. M. Co.*, 54 Utah 459, 181 P. 593; Schneider Workmen's Compensation Law, 159; Hon-

nold Workmen's Compensation, 208; *Thompson* v. *Twiss,* 90 Conn. 444, 97 A. 328, L. R. A. 1916E, 506; *Root* v. *Shadbolt & Middleton,* 195 Iowa, 1225, 193 N. W. 634.

Shortly after the accident, Griffith, the general manager of the Griffith Company, made a written statement to a representative of the insurance carrier which, in part, is as follows:

"From station 150 to approximately station 220, a distance of approximately 7000 feet, I entered into a contract with eight men from Santa Clara, Utah, to do the grading and complete the road bed. They were paid on a yardage basis, and no money was to be paid them until the work had been completed and approved by the State Engineer. They were to furnish their own teams, hay feed, grain, water and commissary and we rented to them such equipment in the way of plows, graders, fresnoes, etc., as they needed at so much per day. They hired what employees they needed, and I had nothing to do with hiring or discharging of men. These eight men who took this work had no money and it was verbally agreed that as long as they kept ahead of their work I would pay their current expenses and then such moneys as I paid out would be deducted from what they had coming when the work was completed. Not any particular man of these eight had any more authority than another, they all work together * * *. Everything on that job was under the supervision and control of these eight men, but Bell, the Superintendent, would, of course, if necessary make suggestions to them, but the work was theirs to do and the responsibility rested with them to complete it within the specified time."

Such statement was put in evidence. In some respects it may be said to be in conflict with the testimony of Griffith. He having been a witness called by the applicant, the statement, of course, was properly received in evidence. But the legal effect of it was only as bearing on the credibility of the witness and the weight to be given his testimony. It was not itself primary evidence of the facts therein recited. The witness, however, further testified that the statement was prepared by a representative of the insurance carrier and who was "a denier of claims and knew what to put in that kind of paper," and, while the witness read it over before he signed it, he did so hurriedly, but on a second

reading he questioned the correctness of some of the statements contained in the written statement and explained the particulars wherein it was incorrect. The commission thus, notwithstanding the written statement, had the right to believe the testimony of the witness and to give whatever weight it thought it was entitled to, and was not required to wholly or even partly discredit the testimony or to disregard it.

Further, there is the testimony of the applicant that he hired out to and was in the employ of the Griffith Company. And there is no evidence to show that Gray or any of the eight men working on section 80-B hired or employed the applicant.

On the record we are satisfied there is sufficient competent evidence to justify the finding that the applicant was in the employ of the Griffith Company. The award made is therefore affirmed, with costs.

CHERRY, C. J., and ELIAS HANSEN, EPHRAIM HANSON, and FOLLAND, JJ., concur.